UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

RENEE LANGE,

        Plaintiff,

      v.                                     Case No. 18-C-821

CITY OF OCONTO and
CITY OF OCONTO FALLS,

        Defendants.

## DECISION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Renee Lange filed this action against Defendants City of Oconto and City of Oconto Falls, alleging Defendants discriminated against her on the basis of her disability in violation of Title II of the Americans with Disability Act (ADA), 42 U.S.C. § 12131 *et seq.*, and Section 504 of the Rehabilitation Act (RA), 29 U.S.C. § 794 *et seq.* Plaintiff, who is deaf, claims Defendants violated her rights when officers of Defendants' respective municipal police departments failed to provide her with a sign language interpreter during their interactions. Presently before the court is Defendants' motion for summary judgment. For the following reasons, the motion will be denied.

## BACKGROUND

As an initial matter, Plaintiff contends that Defendants offer inadmissible hearsay evidence in support of their motion for summary judgment. To the extent the statements are offered not to prove the truth of the matter asserted but to establish the effect the statements had on the officers and to put their conduct and behavior in context, they will be considered by the

court. To the extent they are offered for the truth of the matter asserted, they will not be considered, especially where the facts asserted are material and in dispute.

Plaintiff was born deaf, and her primary and preferred method of communication is through American Sign Language (ASL). Pl.'s Proposed Findings of Fact (PPFOF) ¶ 1, Dkt. No. 44. Plaintiff uses a video phone for communication. Although Plaintiff can communicate through reading and writing, she is unable use English to effectively communicate complex information. *Id.*, ¶ 8. Plaintiff also has some ability to read lips but is unable to effectively read lips as a means to communicate. *Id.*, ¶ 11. Plaintiff is a parent of three hearing children: William Lovering, R.L. (who was 16 to 17 years old at the time of the incidents), and B.L. (who was 13 to 14 years old at the time of the incidents). *Id.*, ¶ 2. Although R.L. and B.L. communicate with Plaintiff through sign language, neither child is a "qualified" ASL interpreter. *Id.*, ¶ 5; Defs.' Proposed Findings of Fact (DPFOF) ¶ 5, Dkt. No. 20. B.L. has been diagnosed with a slow-learning disability.

Plaintiff's claims arise from a number of interactions she had with the Oconto Police Department and the Oconto Falls Police Department. Plaintiff claims that she requires an interpreter to communicate effectively with the police, especially during such critical interactions as arrests or police investigations, and as a parent/companion when her children or family members are directly involved in a police investigation or arrest. PPFOF ¶ 10. From August 2014 to July 2016, Plaintiff resided at 329 Pecor Street in Oconto, Wisconsin. She currently resides at 319½ Cherry Street, Oconto Falls, Wisconsin. Plaintiff's boyfriend, Jeremy Parmer, who is hard of hearing and communicates in ASL, lived with Plaintiff from 2014 to 2017. No police officer in the City of Oconto or in the City of Oconto Falls is a qualified ASL interpreter. DPFOF ¶ 7. Both the City of Oconto Police Department and the City of Oconto Falls Police Department have an unwritten policy to request qualified ASL interpreters through the Oconto County Sheriff's Office, which maintains a list of interpreters. PPFOF ¶ 16. The Sheriff's Office

contacts interpreters upon the Cities' requests. Plaintiff claims that Defendants did not provide their officers with training on how to contact an interpreter. Pl.'s Resp. to DPFOF ¶ 10, Dkt. No. 45.

**A. Plaintiff's Interactions with the City of Oconto Police Department**

Between August 14, 2014 and August 2016, the City of Oconto Police Department had over 50 contacts with Plaintiff where a Police Department Incident Report was prepared. DPFOF ¶ 11. The majority of these contacts occurred prior to the May 30, 2016 incident at issue and were initiated by either Plaintiff or her children. Plaintiff claims that she routinely notified Oconto Police Department officers that she was deaf and requested an interpreter but an interpreter was never provided. PPFOF ¶ 40. Defendants contend that, with a few notable exceptions, Plaintiff did not request an interpreter during these contacts. Defs.' Resp. to PPFOF ¶ 40, Dkt. No. 59. The City of Oconto did not have any ADA written policies in place pertaining to effective communication with deaf and hard-of-hearing individuals prior to January 2018. PPFOF ¶ 16.

On May 30, 2016, Officer Sowle was dispatched to Plaintiff's residence on a neighbor's noise complaint. DPFOF ¶ 19. Officers Sowle and Belognia were aware that Plaintiff was deaf. PPFOF ¶ 46. On arrival, Sowle could hear banging and loud noises, and R.L. stated her mom's friends were banging on the doors. *Id.* A female exited the bathroom with a pipe of freshly packed marijuana, and Officer Belognia took the pipe. DPFOF ¶ 20. R.L. stated that Plaintiff signed to the female to play dumb with the cops. The female was issued a municipal citation for paraphernalia. *Id.* Plaintiff began yelling and screaming at R.L. As Plaintiff yelled, Officer Sowle could smell a strong odor of intoxicants coming from her. Defendants assert that R.L. signed to her mother that she did not call the police and asked Officer Sowle to tell Plaintiff the same. Plaintiff claims that R.L. was not actually interpreting for her and that the officers did not know sign language and would not be able to observe what R.L. actually signed to her mother.

3

PPFOF ¶ 48; Pl.'s Resp. to DPFOF ¶ 21. She contends that her children did not always accurately interpret what she said and would provide the police with the version of the facts that was most favorable to their side of the story. PPFOF ¶ 14. Sowle tried to tell Plaintiff that the neighbor complained and wrote on his notepad to please be quiet. He showed the notepad to Plaintiff numerous times. Although he stated that a neighbor had complained, he did not write this statement on the notepad. DPFOF ¶ 21. The parties ultimately calmed down and agreed to go to bed. *Id.*, ¶ 22. Officers Sowle and Belognia told them that if officers needed to return, someone would go to jail. *Id.* During this interaction, Sowle did not ask Plaintiff if she needed an interpreter. PPFOF ¶ 45. Plaintiff claims that she asked the police, through R.L., to get her an interpreter but the police refused to do so. *Id.*, ¶ 49. She also contends that she asked the police to write with her and that the officers refused. *Id.*, ¶ 50.

Approximately fifteen minutes later, Officer Sowle received a second call from Plaintiff's residence and returned to the scene. Officer Sowle observed that the front door was open, and he could hear yelling from inside. DPFOF ¶ 23. R.L. came outside and stated that Plaintiff locked them out of the house, that Plaintiff was yelling and screaming, and that Plaintiff was hitting her. *Id.* Some of the neighbors came outside and stated that Plaintiff was hitting the children and that the children were also hitting Plaintiff. *Id.*, ¶¶ 24–25. Plaintiff denies hitting R.L. Pl.'s Resp. to *Id.*, ¶ 23. Plaintiff came out of the house and was yelling. *Id.*, ¶ 25. R.L. signed that Plaintiff was being arrested for disorderly conduct. *Id.*, ¶ 26. Although Defendants contend that Officer Sowle placed Plaintiff in handcuffs in her front because R.L. told Officer Sowle that handcuffing deaf individuals in the back takes away their speech, *id.*, Plaintiff claims she was handcuffed behind her back. PPFOF ¶ 53. As the officers placed Plaintiff in the squad car, R.L. told the officers that Plaintiff was requesting an interpreter. DPFOF ¶ 27. Officer Sowle informed dispatch of Plaintiff's request. *Id.* Once Plaintiff was placed in the squad car, she was laughing,

4

yelling, and banging around. *Id.*, ¶ 28. When she arrived at the jail, Plaintiff asked why she was being arrested. Officer Sowle wrote on his notepad that she was arrested for disorderly conduct. Sergeant Julie Schall also wrote down that Plaintiff was arrested for disorderly conduct, for fighting in the street with her kids, and for yelling and screaming outside when she was advised numerous times to be quiet. *Id.* Plaintiff filed a complaint after her arrest. *See id.*, ¶¶ 35–38.

**B. Plaintiff's Interactions with the City of Oconto Falls Police Department**

Plaintiff moved to the adjacent city of Oconto Falls, which is approximately 15 miles from the city of Oconto, in the fall of 2016. After her move, the Oconto Falls Police Department also had numerous contacts with Plaintiff, her family, and her boyfriend, Jeremy Parmer. *Id.*, ¶ 39. At the time of the incidents, the Oconto Falls Police Department did not provide any specific training to its officers on what to do if they encounter a deaf or hard-of-hearing individual. PPFOF ¶ 15.

On November 13, 2016, at approximately 10:07 p.m., Officer Corey Rank was dispatched to Plaintiff's residence for an active disturbance. *Id.*, ¶ 75; DPFOF ¶ 40. Dispatch advised that B.L. sent a message his uncle, Douglas Macklin, about being threatened by a knife. DPFOF ¶ 40. Deputy Christensen and Deputy Longsine of the Oconto County Sheriff's Department assisted Officer Rank. *Id.* Officer Rank attempted to open the front door of the residence once he arrived on scene, but it was locked. *Id.*, ¶ 41. As he stood in the street, Officer Rank could see an adult male and an adult female swinging and pushing each other. *Id.* The deputies attempted entry at the rear door and got an answer at that door. They placed Parmer in hand restraints and detained him in the squad car. *Id.*, ¶ 42. Officer Rank made contact with B.L. B.L. told the officers that Parmer is hard of hearing and was not wearing his hearing aids and that Plaintiff is deaf. PPFOF ¶ 75. B.L. explained that Plaintiff and Parmer were in a bad mood and started fighting after their friends had left the residence. Officer Rank entered the apartment and observed some furniture

5

moved around, potting soil strewn across the floor, and two empty Kessler 1.75L bottles. DPFOF ¶ 43. Officer Rank told B.L. that he needed help from Plaintiff on paperwork. B.L. explained that a knife was on the kitchen counter and that he was afraid. Officer Rank believed Plaintiff was uncooperative. *Id.*, ¶ 44. He arrested Parmer for disorderly conduct and transported him to the Oconto County Jail. *Id.*, ¶ 45. Probation and parole put a hold on Parmer for the charge. *Id.* Plaintiff claims that, without the aid of an interpreter, she did not understand the allegations against Parmer or why he was being arrested. PPFOF ¶ 77.

On November 14, 2016, Officer Vandenberg went to Plaintiff's residence for a follow up. B.L. stated that Parmer and Plaintiff got into an argument and were pushing each other. He observed a knife on the counter and took the knife so that no one got injured. DPFOF ¶ 46. Officer Vandenberg asked B.L. if he felt safe at home, and he responded "yes." *Id.*, ¶ 47.

On February 2, 2017, Officer Jamie Kuhn was dispatched to 342 Columbia Avenue after Laurie King, a deaf individual, called the deaf translator and reported that she got punched in the face. *Id.*, ¶ 49. Upon arrival, King was outside holding a tissue to her bloody nose and stated that Parmer had punched her. *Id.* King stated that she was walking her dog and someone came up behind her, punched her in the face, knocked her down, and hit her again. King recognized the hat the man was wearing as a very distinctive one that Parmer wore. *Id.*, ¶ 50. King stated that she had been fighting with Plaintiff about money and that Plaintiff and Parmer sued her in small claims court. She also stated that Parmer had previously punched her in the face in Milwaukee. *Id.*, ¶ 51.

Officer Kuhn then went to Plaintiff's residence at approximately 7:49 p.m. and explained that she wanted to see Parmer. B.L. stated that Parmer was not at the residence. *Id.*, ¶ 52. Officer Kuhn explained that Parmer had punched King in the face, and B.L. signed that information to

6

Plaintiff. *Id.* Plaintiff tried to explain to the police that they needed an interpreter but her requests were ignored. PPFOF ¶ 84.

Eventually, B.L. stated that Parmer was upstairs and had not left all day. Parmer also stated that he was home all day. DPFOF ¶ 53. Officer Kuhn asked B.L. to sign to Parmer that he was under arrest and that probation put a hold on him. Parmer and Plaintiff became extremely agitated and began swearing. *Id.*, ¶ 54. Officer Kuhn searched Parmer incident to arrest, and he said he would "shoot the bitch." *Id.*, ¶ 55. Plaintiff stated Officer Kuhn had no right to arrest Parmer and told Kuhn to get out of the house. *Id.* Plaintiff claims that without an interpreter, she was unable to fully understand why Parmer was being arrested and effectively communicate with the police officers. PPFOF ¶ 87.

The following day, at 1:35 a.m., Plaintiff reported to the Police Department that King had harassed Plaintiff through Facebook and requested a supervisor. DPFOF ¶ 56. Officer Kuhn was on duty at the time Plaintiff made her report. Dispatch advised that no supervisor was available, and Plaintiff responded that she did not want dispatch to send Officer Kuhn. *Id.* At 8:15 a.m., Plaintiff and B.L. arrived at the Oconto Falls Police Department. Plaintiff used B.L. as an interpreter and indicated that she wanted to file a report of harassment by King. Plaintiff also complained about Parmer's arrest and stated she had proof that King lied about getting punched by Parmer. *Id.*, ¶ 57. Plaintiff explained that she received a Facebook message from King at 12:50 a.m. *Id.*, ¶ 58. In the Facebook post, King apologized for lying to the police and stated that she missed Plaintiff as a friend. *Id.*, ¶ 59. At 9:00 a.m., police officers interviewed King at the police station. *Id.*, ¶ 60. King claimed no knowledge of Facebook or how Facebook messenger works and stated she did not have a Facebook account. *Id.* The Department looked into the Facebook account and determined a profile was created to appear as King. *Id.* ¶ 61. Plaintiff denies creating King's Facebook profile. Pl.'s Resp. to DPFOF ¶ 61.

A search warrant was subsequently prepared for Plaintiff for the seizure of all electronic devices and the hat King had described. Judge Conley signed the search warrant at 1:18 p.m. DPFOF ¶ 62. Chief Olsen and Officer Fischer executed the search warrant at 2:56 p.m. *Id.*, ¶ 63. Chief Olsen was concerned that Plaintiff would attempt to destroy evidence and did not want an interpreter assisting with the warrant since the warrant explained everything the police were looking for and the reasons they were looking for it. B.L. interpreted for Plaintiff once the officers arrived. *Id.* Plaintiff asserts that she did not understand that the police had a warrant to seize her devices or what was written in the warrant. PPFOF ¶ 91. Plaintiff requested an interpreter numerous times, and Chief Olsen denied her request. *Id.*, ¶ 92. Plaintiff stated she was going to sue Oconto Falls for failing to provide an interpreter. The officers advised that Plaintiff was facing charges of obstruction and that a report would be forwarded to the District Attorney. DPFOF ¶ 64. The officers took all electronic devices, a winter hat that matched King's description, and numerous items of drug paraphernalia that were in plain sight. *Id.*, ¶ 65.

On February 14, 2017, Plaintiff contacted the Department to obtain a copy of the February 2, 2017 video from the Marinette Shell Gas Station at 11:00 a.m. that would show Parmer wore different clothes than the ones described by King. Plaintiff also called the Shell Gas Station, the Oconto County District Attorney, the Marinette County Sheriff's Office, and Oconto Falls' mayor. *Id.*, ¶ 66. The next day, Plaintiff and B.L. arrived at the Department. Plaintiff insisted that she receive the Shell Gas Station video. B.L. was advised to tell Plaintiff that she would be arrested if she continued. *Id.*, ¶ 67. The officers issued Plaintiff a citation for harassment of officers at the Oconto Falls Police Department and City officials. Chief Olsen also sent Plaintiff a letter explaining the citation and the reason it was issued. *Id.*, ¶ 68.

On June 15, 2017, Plaintiff called the police to file a complaint against King after she followed her in a library parking lot. Officer Keith Fischer responded to Plaintiff's home. PPFOF

8

¶ 98. During this encounter, police officers relied on B.L. to interpret for them, against Plaintiff's wishes. *Id.*, ¶ 99.

**LEGAL STANDARD**

Summary judgment is appropriate when the movant shows that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the court must view the evidence and make all reasonable inferences that favor them in the light most favorable to the non-moving party. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

**ANALYSIS**

**A. ADA and RA Claims**

Plaintiff claims Defendants discriminated against her in violation of Title II of the ADA and Section 504 of the RA by failing to accommodate her disability when officers refused to obtain an ASL interpreter during their encounters with her. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity,

or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *see also Discovery House, Inc. v. Consol. City of Indianapolis*, 319 F.3d 277, 279 (7th Cir. 2003) ("Title II of the ADA prohibits a public entity from denying equal services to individuals because of their disabilities."). Title II defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable modifications . . . or the provision of auxiliary aids and services, meets the essential requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

In order to state a Title II claim, a plaintiff generally must prove (1) that she is a qualified individual with a disability; (2) that she was denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability. *See Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015) (citation omitted). Where the plaintiff alleges "discrimination based on a public entity's refusal to provide a reasonable accommodation, the plaintiff must also establish that the plaintiff requested an accommodation (or the need for one was obvious) and that the public entity failed to provide a reasonable accommodation." *Schwarz v. The Villages Charter School, Inc.*, 165 F. Supp. 3d 1153 (M.D. Fla. 2016) (citations omitted). Section 504 of the RA states, in pertinent part, that:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. § 794(a). A Rehabilitation Act claim requires the plaintiff to allege that (1) she "is a qualified person (2) with a disability and (3) the [state agency] denied [her] access to a program or activity because of [her] disability." *Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012). The plaintiff must also establish that the defendant receives federal funding. *Id.* "The

Seventh Circuit generally construes Title II and Section 504 consistently in most respects '[i]n view of the similarities between the relevant provisions . . . and their implementing regulations.'" *See Prakel v. Indiana*, 100 F. Supp. 3d 661, 680 (S.D. Ind. 2015) (quoting *Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 607 (7th Cir. 2004)). The parties do not dispute that Plaintiff is a "qualified individual with a disability" or that the police departments are "public entities." Instead, the parties contest whether Plaintiff was excluded from participation in, or denied the benefit of, some "services, programs, or activities" or was "subjected to discrimination" by reason of her disability. 42 U.S.C. § 12132. The court will address Plaintiff's interactions with Defendants in turn.

### 1. Interactions with the City of Oconto Police Department

Plaintiff asserts that she did not receive effective communication during her encounter with the Oconto Police Department on May 30, 2016. Plaintiff claims that, without the aid of a qualified interpreter, she was unable to communicate with the officers and did not understand why she was being arrested. As an initial matter, Defendants contend that Plaintiff's request for an interpreter was unreasonable in substance and timing because she needed to be removed for the safety of her children. But viewing the record from Plaintiff's perspective, there was no exigent threat to the officers or third parties. Even though Plaintiff was agitated and angry, she was not threatening anyone's safety at the time the officers arrived. Accordingly, summary judgment cannot be granted on this basis. *See Spencer v. Dawson*, No. 04 C 5048, 2006 WL 3253574, at *11 (N.D. Ill. Nov. 7, 2006).

Defendants also assert that the City of Oconto officers reasonably relied on an established pattern and practice of relying on Plaintiff's children as well as pen and paper to facilitate communication with Plaintiff. In addition to the fact that the ADA regulations state that public entities cannot rely on a minor child to interpret or facilitate communication, *see* 28 C.F.R.

11

§ 35.160(c)(3), Plaintiff claims that her children were unreliable to act as impartial interpreters and did not always interpret accurately. She asserts that her children provided officers with a version of facts that was most favorable to their side of the story. Plaintiff also asserts that the officers handcuffed her in the back, which limited her ability to communicate with the officers. Although Defendants contend that they have been able to communicate with Plaintiff through writing in previous encounters with Plaintiff, Plaintiff asserts that, based on her limited English capabilities, triable issues of material fact exist regarding whether writing was effective in a custodial police setting. She notes that the officers did not write with her at her residence and the officers first provided written notes to Plaintiff while she was at the Oconto County Jail. Plaintiff maintains that, even though Officer Sowle requested an interpreter, he remained at the Oconto County Jail to process Plaintiff's arrest and continued to communicate with her without making any efforts to ascertain the whereabouts of the interpreter. Construing the evidence in the light most favorable to Plaintiff, which the court is required to do at this stage, a reasonable jury could find that the officers did not provide effective communication on May 30, 2016. Accordingly, the City of Oconto is not entitled to summary judgment as a matter of law with respect to this claim.

### 2. Interactions with the City of Oconto Falls Police Department

In her complaint, Plaintiff claims that the City of Oconto Falls police department failed to ensure effective communication with her on November 13, 2016, February 2, 2017, February 3, 2017, and June 5, 2017. As an initial matter, nothing in the record suggests that the City of Oconto Falls Police Department had any interaction or contact with Plaintiff on June 5, 2017. Accordingly, Plaintiff has failed to establish a violation of the ADA or RA on June 5, 2017.

As to the remaining dates, Defendants assert that any demand for an interpreter was unreasonable because Plaintiff was never arrested. But a public entity's Title II obligations are

12

not limited to providing accommodations for only arrestees; they must also ensure effective communication to members of the public. *See* 28 C.F.R. § 35.160(a)(1). As a result, Defendants were not exempt from providing Plaintiff with auxiliary aids during their interactions with her. Plaintiff claims the officers failed to provide auxiliary aids. During all four encounters, the officers relied on B.L. to interpret for Plaintiff. Plaintiff asserts that the officers violated 28 C.F.R. § 35.160(c)(3) when they used B.L. as an interpreter and that B.L. was unable to interpret effectively, accurately, and impartially during each encounter. With respect to the November 13, 2016 and February 2, 2017 arrests of Parmer, Plaintiff contends that she did not understand the allegations against Parmer and was unable to effectively communicate with the officers about Parmer's cases. And on February 3, 2017, Plaintiff claims that she did not understand that the police had a warrant to seize her devices. Chief Olsen decided against securing an interpreter for the execution of the warrant and instead chose to rely on B.L. to interpret and to show Plaintiff the search warrant. But Plaintiff claims that when she was showed the warrant, she did not understand what was written in it. Although Chief Olsen was concerned Plaintiff would destroy evidence, nothing in the record as it stands suggests that an exigent circumstance existed or that the use of an interpreter would allow Plaintiff to destroy evidence. Without resolving the factual disputes raised with respect to Plaintiff's ability to understand the officers' communications with her, the court cannot conclude, as a matter of law, that the officers effectively communicated with Plaintiff.

**B. Claims for Compensation under the RA**

Defendant asserts that Plaintiff's claims for compensation under the Rehabilitation Act have no merit. Even if a plaintiff shows a violation of the Rehabilitation Act, she cannot "recover compensatory damages without showing intentional discrimination." *See Strominger v. Brock*, 592 F. App'x 508, 511 (7th Cir. 2014). A plaintiff may prove discriminatory intent by showing

13

that a defendant was deliberately indifferent to her statutory rights. *See Lacy v. Cook Cty., Illinois*, 897 F.3d 847, 863 (7th Cir. 2018). Deliberate indifference requires both "(1) 'knowledge that a harm to a federally protected right is substantially likely,' and (2) 'a failure to act upon that likelihood.'" *Id.* (quoting *S.H. v. Lower Merion Sch. Dist.*, 729 F.3d 248, 263 (3d Cir. 2013)). To prevail, Plaintiff must show that Defendants knew there was a substantial likelihood that the officers would be unable to communicate effectively with her absent an interpreter but still made a "deliberate choice" not to provide one. *See McCullum v. Orlando Regional Healthcare Sys., Inc.*, 768 F.3d 1135, 1147–48 (11th Cir. 2014) (citation omitted). In this case, Plaintiff has asserted that her numerous requests for an interpreter were denied or ignored and that Chief Olsen laughed off her requests. On this basis, Plaintiff has created a dispute of fact about whether Defendants knew it was substantially likely that the accommodations that were provided were ineffective. Accordingly, the court will deny Defendants' motion for summary judgment.

**C. Injunctive Relief**

Plaintiff requests that she be provided with necessary interpreter services during every future interaction she has with Defendants. Defendants assert that Plaintiff does not have standing to seek prospective injunctive relief. To establish standing, the plaintiff must show "(1) injury in fact, which must be concrete and particularized, and actual and imminent; (2) a causal connection between the injury and the defendant's conduct; and (3) redressability." *Scherr v. Marriott Int'l Inc.*, 703 F.3d 1069, 1074 (7th Cir. 2013) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). Plaintiff asserts that since the filing of her complaint, she has required the services of the Oconto Falls Police Department on approximately 20 occasions and that, during these encounters, the Police Department has failed to provide interpreter services. But the fact that Defendants did not provide Plaintiff with an interpreter does not mean that they violated the ADA or the RA. The record provides no reason to believe that providing an interpreter would be

14

necessary or reasonable in every encounter Plaintiff has with Defendants. The court will not issue a blanket order finding that an interpreter is required in every instance because such a need must be assessed on a case-by-case basis. The court may revisit the question of whether injunctive relief is appropriate after trial. In any event, it is premature to dismiss Plaintiff's request for such relief on the record as it now stands.

## CONCLUSION

For these reasons, Defendants' motion for summary judgment (Dkt. No. 19) is **DENIED**. The Clerk is directed to set the matter for a telephone conference for further scheduling.

**SO ORDERED** at Green Bay, Wisconsin this 3rd day of March, 2020.

s/ William C. Griesbach
William C. Griesbach, District Judge
United States District Court
